UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH HIGE,

    Plaintiff,

v.

TURBONETICS HOLDINGS, INC.,

    Defendant.
    _____/

Case No. 09-cv-10025

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE, FOR TRANSFER (D/E 3)**

    This is an action for breach of an employment contract by the former chief executive officer of a manufacturing company, Turbonetics Holdings, Inc. ("Turbonetics") against his former employer. Before the Court is defendant's motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer the case to the Northern District of Ohio, where the limited partnership that owns and operates Turbonetics is located. Upon review of the motion and the facts in the record, the Court holds that it does have personal jurisdiction over Turbonetics and therefore will deny the motion to dismiss. The Court also finds that transfer is inappropriate under the facts in the record and therefore defendant's alternative motion to transfer will also be denied.

**FACTS**

    Turbonetics is a Delaware corporation with its principal place of business in Simi Valley, California. Decl. of Ryan Meany, Exh. 1, Motion to Dismiss ("Meany decl"). Turbonetics has an office in Cleveland, Ohio, but no office in Michigan. *Id.,* ¶ 3. Edgewater Capital Partners ("Edgewater") is a Delaware limited partnership, a private equity investment fund with its principal place of business in Ohio. *Id.,* ¶4. Turbonetics develops

turbochargers for performance cars and diesel trucks. Affidavit of Joseph Hige, Exhibit 1 to Response ("Hige aff."), ¶ 27.

Hige contacted Ryan Meany, a principal in Edgewater, in July 2006 regarding two possible acquisitions for Edgewater. Meany decl., ¶ 5. Hige executed an Operating Partner Agreement with Edgewater which provided for compensation if Edgewater acquired a company identified by Hige. *Id.*

Edgewater acquired Turbonetics, Inc., then a division of Kelly Aerospace, Inc. *Id.*, ¶ 6. Hige was installed as Chief Executive Officer ("CEO") of Turbonetics and signed an Employment Agreement with Turbonetics on January 8, 2007. *Id.*, ¶ 7. The Employment Agreement was executed by Meany in Ohio as chairman of the board on behalf of Turbonetics and by Hige on his own behalf in Michigan. *Id.*, ¶ 9; Hige aff., ¶ 30. The agreement states that notices to the company are to be sent to Edgewater on behalf of Turbonetics in Cleveland, Ohio, and notices to Hige are to be sent to Northville, Michigan. Employment Agreement, Exhibit A to Meany decl. ("Employment Agreement"). The choice of law provision identifies Delaware as the relevant law, and there is no choice of forum provision. *See generally* Employment Agreement. There is a nationwide covenant not to compete. *Id.*, ¶ 11(a).

As CEO of Turbonetics, Hige was responsible for managing Turbonetics' operations in Simi Valley, California. Meany decl., ¶ 10. Hige commuted from Michigan to California to perform these duties. *Id.* He first stayed in a hotel in California, and then rented a room in a home in Simi Valley. *Id.* Turbonetics paid all of Hige's commuting costs, travel, food, hotel and board expenses, and Hige attended meetings of Turbonetics Board of Directors in California and telephonically from California. *Id.* Hige traveled to Cleveland four times as CEO of Turbonetics to meet with the Turbonetics board of directors. *Id.*, ¶ 12.

Turbonetics terminated Hige's employment on October 10, 2008. Meany decl. ¶ 13. Hige filed this action two months later in Wayne County Circuit Court, and it was removed to this Court on January 5, 2009. Hige alleges that Turbonetics breached its duties under the employment agreement by terminating the plaintiff and otherwise preventing him from performing his duties under the employment agreement.

Connections with Michigan

Hige lives in Michigan. Hige aff.,¶ 1. He signed and accepted the employment contract in Michigan. *Id.*, ¶ 30. Hige points out that the employment contract did not require that he work in California as CEO of Turbonetics, and he attests that he worked in Michigan about one-half of the time that he was running Turbonetics since 2007, apparently out of his home. *Id.*, ¶¶ 30-35. The notice of termination was sent to Hige in Michigan. Employment Agreement, ¶ 8(d), 16. Hige has documents in Michigan, including his copy of the employment contract and his computer containing email correspondence on behalf of Turbonetics. Hige aff., ¶¶ 76-80. Hige also states that key witnesses are in Michigan, including himself, his wife, and employee witnesses of Michigan companies. *Id.*, ¶¶ 81-82. He identifies several additional potential witnesses as employees of Michigan companies, including Ford and GM, who allegedly tested Turbonetics turbocharger products for use in future cars and trucks. *Id.*

Hige states that Turbonetics was "too heavily focused on the Asia import business, and his strategy as CEO was to diversify into domestic muscle cars and diesel trucks. Hige aff., ¶ 36. Hige states that in 2008, he attended three meetings with Ford in Dearborn, Michigan, two meetings with GM in Grand Blanc, Michigan, and he made multiple calls to Ford and GM employees in Michigan to convince them to purchase Turbonetics products. *Id.*, ¶¶ 42-44.

Hige also states that John Vieth, the sales director for Turbonetics, spent 15-20% of his time developing sales to Michigan and came to Michigan two or three times a month to visit customers. Hige aff., ¶ 47. Hige provided Vieth with five contacts in Michigan. *Id.*, ¶ 52. Meany attests, however, that no sales to any customers resulted from any of Hige's contacts in Michigan. Declaration of Ryan Meany dated February 26, 2009, ("Meany II decl.") ¶ 4, Exhibit to Reply. Hige attests that Turbonetics does about $500,000 sales in Michigan per year out of a total of $11.4 million in annual sales. Hige aff., ¶ 54. Meany, however, attests that Turbonetics sold a total of $455,569.29 worth of products to eleven customers in Michigan over the course of two years, representing only 2% of Turbonetics total sales for those years, and the vast majority of those sales, over $420,000, were to just two customers. Meany II decl., ¶ 3.

Turbonetics has no office in Michigan and is not registered to do business in Michigan. Meany decl., ¶ 3. Turbonetics has eight active customers in Michigan who are qualified to purchase products from Turbonetics. Meany II decl., ¶ 6. These are primarily warehouse distributors who resell the products at retail, as all other Michigan customers were deemed to be too small to purchase directly from Turbonetics and diverted to retail distributors. *Id.*

Turbonetics has an interactive website available to customers, including customers in Michigan, and listed distributors, including three distributors in Michigan. Hige aff., ¶ 56. Any products ordered through the Turbonetics website, however, are actually ordered through a separate website maintained by Shopatron. Meany II decl., ¶ 7. Orders placed through Shopatron are referred to Turbonetics authorized retailers to be filled, and payment for orders filled by retailers are sent to the retailer, not to Turbonetics. *Id.* If no retailer agrees to fill the order, it is then referred to Turbonetics. *Id.* Total Shopatron orders filled

directly by Turbonetics were $6,854 in 2007 and $7,274 in 2008, and Turbonetics filled no Shopatron order from Michigan in either 2007 or 2008. *Id.*

## LEGAL STANDARD

The legal standard on a motion to dismiss for lack of personal jurisdiction depends on whether the district court has held an evidentiary hearing. Where the court considers a motion to dismiss without permitting discovery or holding an evidentiary hearing, as is the case here, the Court must consider the pleadings and affidavits on file in the light most favorable to the plaintiff. *Bird v. Parsons*, 289 F.3d 865, 872 (6th Cir. 2002). The Court is not to weigh the controverting assertions of the party seeking dismissal. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). The plaintiff bears the burden of establishing personal jurisdiction over the defendant. *International Technologies Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997). Dismissal is only appropriate if all the specific facts alleged by the plaintiff collectively fail to state a prima facie case for the exercise of jurisdiction. *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997).

## ANALYSIS

I.  SHOULD THE COMPLAINT BE DISMISSED BECAUSE THIS COURT LACKS PERSONAL JURISDICTION OVER TURBONETICS?

Turbonetics argues that the complaint should be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure because this Court does not have personal jurisdiction over Turbonetics under either the Michigan long arm statute or due process considerations.

In diversity cases such as this, courts look to the law of the forum state to determine whether personal jurisdiction exists. *Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000); Nationwide Mutual Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 793 (6th Cir. 1996). Under Michigan law, the exercise of personal jurisdiction is valid only if it is both

authorized by one of Michigan's long-arm statutes and meets constitutional due process standards.  *Calphalon*, 228 F.3d at 721.  The relevant Michigan long-arm statutes for asserting personal jurisdiction over Turbonetics are MCL § 600.711 and MCL § 600.715. The Michigan long arm statutes have been construed to grant courts sitting in Michigan the broadest scope of jurisdiction consistent with due process.  *CSX Transp., Inc. v. Union Tank Car Co.*, 247 F. Supp. 2d 833, 836 (E.D. Mich. 2002).

### A. Is General Personal Jurisdiction Available over Turbonetics Under MCL 600.711?

General personal jurisdiction is jurisdiction for all purposes.  MCL 600.711 provides for general personal jurisdiction over a corporation that is (1) incorporated in Michigan, (2) has consented to jurisdiction in Michigan, or (3) carries on a "continuous and systematic part of its general business within the state."  MCL § 600.711.  It is undisputed that Turbonetics is not incorporated in Michigan and has not consented to the jurisdiction of this Court, so this Court can only exercise jurisdiction pursuant to MCL 600.711 if Turbonetics carries on a "continuous and systematic part of its general business within the state."

Turbonetics argues that it does not carry on a "continuous and systematic part of its general business" in this state because it does not have an office in Michigan, does not own or lease property in Michigan, and does not have a bank account in Michigan.

General personal jurisdiction does not require physical presence within the state but is proper only if the defendant's contacts with the state "'approximate[] physical presence within a state's borders.'"  *Cadle Co. v. Schlichtmann*, 123 Fed. Appx. 675, 677 (6th Cir. 2005) (quoting *Bird*, 289 F.3d at 874).  The fact that a defendant maintains a website that is accessible to anyone over the internet is insufficient to justify general jurisdiction.  *Cadle*, 123 Fed. App. at 677 (citing *Bird*, 289 F.3d at 874 ).

In *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408 (1984), the plaintiff, a Texas resident, sued the defendant, a Columbian corporation, in a Texas court for a wrongful death resulting from a helicopter crash in Peru. The plaintiff asserted that the Texas court could assert general personal jurisdiction over the defendant based upon a single trip to Texas by the defendants' CEO to negotiate a contract, purchases of helicopters and equipment from a Texas manufacturer and related training trips. The Supreme Court held that these contacts were not the kind of continuous and systematic activities that would permit the assertion of in personam jurisdiction, and specifically held that mere purchases, even regular ones, are insufficient to support a state's assertion of general personal jurisdiction.

The Court finds that the assertion of general personal jurisdiction against Turbonetics is not consistent with due process under the standard set forth in the *Helicopteros* decision. Turbonetics does not maintain an office in Michigan; it is not registered to do business in Michigan; Turbonetics had only 11 Michigan customers during the relevant period of time and sales to these Michigan residents accounted for only 2% of Turbonetics sales during the relevant period of time. Turbonetics' contacts with Michigan are neither continuous nor systematic sufficient to justify general personal jurisdiction over Turbonetics. The cases cited by Hige in support of general personal jurisdiction, including *Perkins v. Benguet Consol. Mining* Co., 342 U.S. 437 (1952),[1] and *Michigan National Bank v. Quality Dinette*,

---

[1] Hige relies on *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952), in support of his argument that, notwithstanding the cited authorities, general personal jurisdiction exists over Turbonetics. In *Perkins*, the Court held that due process was satisfied over a Philippine company in a suit by a stockholder in Ohio. Although the corporation itself was foreign, the facts established that the corporation's president and principal stockholder returned from the Philippines to his home in Ohio when Philippine operations were completely halted due to the Japanese occupation. *Perkins,* 342 U.S. at 447-48. While the president was in Ohio, he worked on behalf of the company, maintained files and records of the company, used his home as an office and received salary checks there. *Id.*

7

888 F.2d 462 (6th Cir. 1989), are distinguishable. In *Perkins* the entire center of corporate operations was moved from the Philippines to Ohio; here, the plaintiff is only alleged to have done some of his work from Ohio. *Quality Dinette* is distinguishable because the defendant in that case actually maintained a sales representative in Michigan and conducted general mail order solicitations to potential customers in Michigan thereby constituting sufficient business contacts with the state.

> B. Is Specific or Limited Personal Jurisdiction available under MCL § 600.715 for Hige's Claims against Turbonetics Based Upon His Employment Agreement?

Even though general personal jurisdiction is not available over Turbonetics, jurisdiction would still be appropriate if the facts alleged by the plaintiff support an assertion of specific personal jurisdiction. Specific jurisdiction is authorized in Michigan by MCL § 600.715, which, as relevant here, provides for personal jurisdiction over corporations for suits arising out of the act or acts constituting the transaction of any business within the state. MCL § 600.715(1). Therefore, if Hige's suit against Turbonetics arises from the "transaction of ... business" by Turbonetics in Michigan, then the assertion of jurisdiction over Turbonetics is appropriate in this action. "Transaction of any business" is very broad, and is established by "the slightest act of business in Michigan." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 888 (6th Cir. 2002) (citing *Lanier v. Am. Bd. of Endontics*, 843 F.2d 901, 906 (6th Cir. 1988) (other citation omitted)).

The Michigan long arm statute has been interpreted to extend the reach of Michigan courts to the limits placed upon jurisdiction by the federal constitution. *Green v. Wilson*, 4555 Mich. 342, 350 (1971). The question then is whether the exercise of specific jurisdiction is consistent with the limitations placed by the Constitution upon the exercise of personal jurisdiction.

As described by the Supreme Court in 1985, this is a very fact-specific analysis:

8

> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-476 (1985) (citations omitted).

The Sixth Circuit has established a three-part test for determining whether a state may exercise specific jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Air Products and Controls, Inc. v. Safetech Intern., Inc.* 503 F.3d 544, 550 (6th Cir. 2007) (quoting *So. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). The plaintiff must satisfy each of these elements in order for the court to exercise personal jurisdiction over the defendant.

    A.  <u>Purposeful availment</u>

Even in cases where the cause of action arose in a plaintiff's state, a court may not exercise personal jurisdiction over a defendant where the defendant has not purposefully entered into a connection with the forum state "'such that he should reasonably anticipate being haled into court there.'" *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir. 1989) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). A showing of purposeful availment is "essential." *LAK*, 885 F.2d at 1300 (citations omitted).

Turbonetics cites *LAK, Inc.*, 885 F.2d 1293 (6th Cir. 1989), in support of its argument that Hige cannot meet the "purposeful availment" element. In *LAK*, the defendant Deer Creek was an Indiana general partnership formed by two Indiana residents with a principal place of business in Indiana; it transacted no business in Michigan, it had no real or personal property in Michigan and had no agent for service of process in Michigan. *LAK*, 885 F.2d at 1294. Deer Creek owned a parcel of land in Florida and received an unsolicited inquiry about a possible purchase of the parcel from the plaintiff, a Michigan limited partnership. The parties spoke over the phone several times, with the plaintiff speaking from Michigan, and had several meetings in Florida, but at no time did the defendants go to Michigan on business related to the matter. *Id.* The defendant's attorney also mailed draft agreements to plaintiff's attorney in Michigan. *Id.* The plaintiff signed the purchase agreement in Michigan and then sent it to Indiana, where it was signed by the defendants. The plaintiff ultimately sued the defendant in the district court for the Eastern District of Michigan for anticipatory breach of the purchase agreement. The Sixth Circuit held that the Indiana defendant did not purposefully avail itself of the privilege of transacting business in Michigan and therefore the Michigan courts did not have jurisdiction over the defendant. *Id.* at 1303. It held that the defendants there did not reach out to Michigan for the purpose of creating continuing relationships and obligations with any citizen of that state. *Id.*

*LAK* is distinguishable from the present case because *LAK* dealt with a contract to purchase a real estate parcel in Florida, unlike the present case which deals with an employment contract. The employment contract at issue here was performed at least in part by the plaintiff in Michigan with the knowledge and acquiescense, and even facilitation of the defendant. The contract at issue here also involved the kind of continuing relationship that did not exist in *LAK*, which involved a single purchase of a real estate

parcel. Here, in contrast, the contract at issue is an employment contract with a Michigan resident that was negotiated as part of the larger deal involving the purchase of the Turbonetics company, that was performed for almost two years and that was performed, at least by the plaintiff, partially in Michigan. Further, the plaintiff's uncontroverted affidavit shows that at least some part of his job involved developing business in Michigan. Thus, the present case involves greater Michigan contacts than did *LAK.*

Turbonetics also relies upon the decision in *U.S. ex. rel. Hadid v. Johnson Controls*, Inc., No. 04-60146, 2005 WL 1630098 (E.D. Mich. 2005). *Hadid* involved a claim for breach of an employment contract between a Michigan resident and an Florida-based company for the plaintiff to work as an engineer in the Middle East. The plaintiff resided in Michigan at the time he was hired and was a resident of Michigan when he filed his action. The district court held that this court lacked limited personal jurisdiction over the defendant for purposes of the plaintiff's breach of employment contract because the defendant, in entering into its employment contract with the plaintiff, had not "purposefully availed" itself of the privilege of transacting business in Michigan. The court pointed out that the defendant, RMS, was incorporated in Florida and had no offices, facilities or employees in Michigan. It held that the mere fact that it entered into an employment contract with a Michigan resident did not constitute purposeful availment and therefore limited personal jurisdiction could not be asserted over the defendant.

This case is factually similar to *Hadid* in that it involves an employment contract between a Michigan resident and a foreign company for the resident to work outside of Michigan, and therefore is persuasive authority for finding no personal jurisdiction here. The instant case is distinguishable, however, because Turbonetics has more contacts with Michigan than did the defendant in *Hadid.* Here, the plaintiff actually signed the employment contract in Michigan while in *Hadid* the plaintiff traveled to Florida to sign the

11

employment contract, and here the plaintiff alleges that he actually worked part of the time in Michigan, that he was one of the major shareholders of Turbonetics and that Turbonetics paid Michigan taxes and travel expenses from Michigan and office expenses in Michigan. Turbonetics argues that these added contacts are not significant enough to distinguish *Hadid* because they all involved unilateral decisions by the plaintiff to carry out activities in Michigan and therefore would not be sufficient to constitute purposeful availment. These facts, however, constitute more than the mere unilateral acts of the plaintiff, as argued by Turbonetics. Rather, while the plaintiff may have initiated the contacts, Turbonetics acquiesced and supported the contacts with Michigan by facilitating the work done by the plaintiff in this state. The plaintiff in *Hadid* did none of his work in Michigan and was overseas when the contract was terminated, leading to a conclusion by the Court that the claim did not arise out of the defendant's contacts with Michigan. Finally, the plaintiff here, unlike the plaintiff in *Hadid*, spent at least some portion of his time as an employee in developing business in Michigan.

Turbonetics also cites *Kerry Steel, Inc. v. Paragon Indus. Inc.*, 106 F.3d 147, 151 (6th Cir. 1997). In *Kerry Steel*, the plaintiff, a Michigan steel company, sued the defendant, an Oklahoma pipe fabricator, for breach of contract. The Michigan plaintiff had approached the Oklahoma defendant with an offer to sell it $300,000 worth of steel coils. The parties negotiated via telephone and facsimile, and the defendant accepted the offer by telephone and sent a purchase order to the plaintiff in Michigan. After taking possession of the steel coils in a warehouse in Illinois, the defendant claimed that the coils were nonconforming and refused to pay the full purchase price. The plaintiff filed suit in Michigan, and the defendant moved to dismiss arguing that the Michigan court lacked specific jurisdiction. The district court dismissed and the Sixth Circuit affirmed the dismissal, holding that the plaintiff failed to show that the defendant had purposefully availed himself of the benefits

12

and protections of Michigan law: the initial contact was made by the plaintiff, not the defendant; the defendant responded without leaving home; the defendant had no employees or offices in Michigan and there was no showing that any employee of the defendant had ever been in Michigan for the purpose of conducting business there. *Kerry Steel*, 106 F.3d at 151.

Again, the Court finds that *Kerry Steel* is distinguishable from the facts of the present case. The *Kerry Steel* court emphasized that the contract at issue in that case was a single contract - a "one shot" transaction. *Kerry Steel*, 106 F.3d at 151. In contrast, the contract at issue in the present case involved a continuing relationship with plaintiff, a Michigan resident, as employee. The course of dealings between the parties also supports a finding of purposeful availment in the present case, since the contract here between the parties contemplated a continuing relationship between the plaintiff and the defendant, was executed by the plaintiff in Michigan, and was performed by the plaintiff at least in part in Michigan. The fact that the plaintiff made the first contact is not dispositive. See *Mohasco*, 401 F.2d at 382 (noting that the allegation that the plaintiff had solicited the licensing agreement from the defendant was immaterial because the fact that the defendant was "fortunate enough to get the business without active solicitation" does not diminish the purposefulness of the defendant's choice to contract with the plaintiff) *(quoting Shealy v. Challenger Manufacturing Co.*, 304 F.2d 102, 104 (4th Cir. 1962)).

In sum, the Court finds that by entering into a continuing contract with the plaintiff, which was signed by the plaintiff in this state, was performed by the plaintiff in part in this state, and involved some duties directed toward establishing business in this state, Turbonetics has purposefully availed itself of the privilege of transacting business in Michigan and therefore the first *Mohasco* factor is met.

B. "Arising Under"

Defendant also argues that the plaintiff cannot establish the second prong of the Sixth Circuit's test for limited personal jurisdiction because his claim does not arise under the defendant's contacts with the forum state. Turbonetics argues that Hige's claims involve and arise from the obligations, rights and duties of the parties under the employment agreement, which was performed in California. Further, Turbonetics argues, the decision to terminate the plaintiff was made outside of Michigan and notice was sent from Ohio to Michigan.

The standard for determining that a claim arises out of a defendant's contacts with the forum state is not a demanding one. The plaintiff's claim need not "formally 'arise from' defendant's contacts with the forum;" it is sufficient it the plaintiff's claim has a 'substantial connection' with the defendant's in-state activities." *Third Nat'l Bank. v. WEDGE Group.*, Inc., 882 F.2d 1087, 1091 (6th Cir. 1989) (citing *Mohasco*, 401 F.2d at 384, n.27). The standard is a lenient one. *Bird v. Parsons*, 289 F.3d at 875.

Given this lenient standard, the Court finds that the cause of action arose out of the defendant's contacts with Michigan for purposes of the *Mohasco* test. Hige's claims arise out of his employment agreement with Turbonetics that was executed by at least the plaintiff in Michigan, states that notices to the plaintiff should be sent to Michigan, and, according to the plaintiff's affidavit, was performed at least in part in Michigan, and therefore Hige's claim arise out of Turbonetics' contacts with the forum

C. <u>Reasonableness of exercise of jurisdiction</u>

Third, defendant argues that the exercise of personal jurisdiction by this Court over Turbonetics would be unreasonable. Turbonetics argues that it would substantially burden it to defend this suit in Michigan because all the employees, fact witnesses and evidence it would offer in support of its defenses are located outside of Michigan; all the contractual obligations were to be performed outside of Michigan; and the allegedly breaching conduct

occurred outside of Michigan. Turbonetics argues that therefore Michigan has virtually no interest in the subject matter of this suit.

> In considering whether the exercise of personal jurisdiction is reasonable, the courts consider several factors, including the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies.

*City of Monroe Employees Retirement System v. Bridgestone*, 399 F.3d 651, 666 (6th Cir. 2005). Where a plaintiff satisfies the first two *Mohasco* factors, a presumption arises that the exercise of jurisdiction is reasonable. *Bird*, 289 F.3d at 875 (citing *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996)).

This is not the "unusual case" in which the exercise of personal jurisdiction is unreasonable. *Mohasco*, 401 F.2d at 384. While Turbonetics is a Delaware corporation with its principle place of business in California, the corporate decision-makers and all relevant witnesses are in Cleveland Ohio, which, the Court takes judicial notice, is merely a long drive from the Eastern District of Michigan courthouse in Detroit. Further, the relevant witnesses for Turbonetics appear to be Turbonetics employees, under the defendant's control. Michigan's interest in adjudicating the controversy is at least as strong as that of Ohio's and the plaintiff has an interest in his choice of forum so long as that choice comports with due process. *See Mohasco*, 401 F.2d at 385 ("when the contract is with a resident of [a state], the State's interest in resolving a suit based on the contract and brought by that resident cannot be doubted") (citations omitted). These factors make the exercise of jurisdiction here reasonable and this Court has personal jurisdiction over the defendant.

II. IN THE ALTERNATIVE, SHOULD THE CASE BE TRANSFERRED TO THE NORTHERN DISTRICT OF OHIO?

Turbonetics argues that even if the Court determines that it may exercise jurisdiction over Turbonetics, the Court should still transfer the case to the United States District Court

15

for the Northern District of Ohio for the convenience of the parties and in the interests of justice pursuant to 28 U.S.C. § 1404(a), which provides as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

"'To transfer an action under section 1404(a) the following criteria must be met: (1) the action could have been brought in the transferee district court; (2) a transfer serves the interest of justice; and (3) a transfer is in the convenience of the witnesses and the parties.'" *Fluidtech, Inc. v. Gemu Valves, Inc.*, 457 F. Supp. 2d 762, 766 (E.D. Mich. 2006) (quotation omitted). "[I]n ruling on a motion to transfer under § 1404(a), a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systematic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Business Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991) *(citing Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). The decision is vested in the discretion of the district court. *Stewart,* 487 U.S. at 29.

Turbonetics argues that all the factors for a transfer under § 1404(a) are present here: Turbonetics argues that, first, the case could have been brought in the Northern District of Ohio, because that court has jurisdiction over the defendant; and second, a transfer would serve the interest of justice. In determining whether a transfer would serve the interest of justice, relevant factors include:

> (1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Perceptron, Inc. v. Silicon Video, Inc.*, 423 F. Supp. 2d 722, 729 (E.D. Mich. 2006) (quoting *Overland, Inc. v. Taylor*, 79 F. Supp. 2d 809, 811 (E.D. Mich. 2000) (other citations omitted).

As for the convenience of witnesses and parties and location of documents, Turbonetics argues that Ohio is most convenient for the witnesses and the parties and provides the greatest ease of access to proof in the case. Turbonetics has an office in Ohio and two members of its Board of Directors, including the chairman Meany, who executed the employment agreement on behalf of Turbonetics, are in Ohio. Turbonetics also identifies Chris Childres as a witness with relevant information who lives in Ohio, as well as Tracy Perkins, who lives in Illinois. Turbonetics argues that no witnesses live in Michigan. Hige argues that he lives in Michigan; his wife has knowledge of how he performed his job in Michigan; he has his personal computer and documents in Michigan.

As for the second factor, the location of operative facts, Turbonetics argues that a substantial portion of the operative facts occurred in Ohio, because Meany executed the employment agreement in Ohio, he supervised the plaintiff from Ohio, and meetings with the plaintiff regarding his performance and ultimate termination all occurred in Ohio. Hige argues, on the other hand, that he performed his job 50% of the time in Michigan.

On the availability of compulsory process, Turbonetics argues that nearly all of the witnesses relevant to the action are located in Ohio and subject to the subpoena power of the Ohio courts, while there are no relevant, non-party witnesses subject to the subpoena power of this court. Hige argues that numerous non-party witnesses are located in Michigan, including people in the automotive industry that he had contact with in performing his job. Turbonetics argues in response that given the small amount of sales in Michigan these witnesses are unlikely to provide relevant testimony.

On the fourth factor, the plaintiff's choice of forum, Turbonetics argues that the plaintiff's choice of forum should be given little weight here because the factor has less weight when "none of the conduct complained of occurred in the forum selected by the plaintiff." *Neff Athletic Lettering Co. v. Walters*, 524 F. Supp. 268, 272 (S.D. Ohio 1981). Hige responds correctly that a plaintiff's choice of forum is typically granted substantial weight in the balancing of factors considered for transfer, particularly when the plaintiff resides in the forum. *Steelcase, Inc. v. Smart Technologies, Inc.*, 336 F. Supp. 2d 714, 720 (W.D. Mich. 2004) (citations omitted).

On the fifth factor, whether a transfer of the case to Ohio, Turbonetics argues that Michigan has little if any interest in deciding this controversy while Ohio has substantial interest, because Turbonetics conducts business in Ohio, has an office in Ohio and the plaintiff approached Meany in Ohio to trigger the entire transaction that resulted in Ohio, and the case has the potential for greater financial impact in Ohio. Hige responds by pointing out Michigan's interests due to the presence of the plaintiff here and his economic harm here.

Upon balancing these factors, the Court concludes that the defendant has failed to carry its burden of showing that a transfer to the Northern District of Ohio is in the interests of justice. The plaintiff's choice of forum is given a great deal of weight in the balancing to determine if the case should be transferred, and Turbonetics has failed to come forward with strong reasons in favor of a transfer to Ohio. The company itself is a California company, and the performance of the contract occurred in California, rather than Ohio. Further, the issue of compulsory process is not a strong one because neither side has identified many non-party witnesses whose testimony will be relevant to the case. The defendant's motion to transfer this case to the Northern District of Ohio will therefore be denied.

**ORDER**

Wherefore it is hereby **ORDERED** that defendant's motion to dismiss for lack of personal jurisdiction or in the alternative to transfer is **DENIED**.

                                           s/Stephen J. Murphy, III
                                           STEPHEN J. MURPHY, III
                                           United States District Judge

Dated: September 11, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 11, 2009, by electronic and/or ordinary mail.

                                           Alissa Greer
                                           Case Manager